[40 NYS3d 33]

In the Matter of SUSAN CLAIR et al., Appellants, v CITY OF NEW
YORK et al., Respondents.

First Department, October 13, 2016

### APPEARANCES OF COUNSEL

*Cuti Hecker Wang LLP*, New York City (*Eric Hecker* and *Daniel Mullkoff* of counsel), for appellants.

*Zachary W. Carter, Corporation Counsel*, New York City (*MacKenzie Fillow* and *Scott Shorr* of counsel), for respondents.

### OPINION OF THE COURT

KAHN, J.

In this hybrid CPLR article 78 proceeding and declaratory judgment action, petitioners include one natural person owning an "independent" New York City yellow taxicab medallion, which is restricted to use with only one taxicab, and four corporate owners of both independent and "minifleet" medallions, the latter of which authorize the operation of an unlimited number of yellow taxicabs. Petitioners seek annulment of the "Accessibility Rules" (35 RCNY 51-03 *et seq.*, as amended) promulgated by respondent New York City Taxi and Limousine Commission (TLC), as violative of section 19-533 of the Administrative Code of the City of New York, and as arbitrarily, capriciously and in error of law mandating their conversion to accessible vehicles in the absence of a TLC-approved hybrid electric vehicle which is also accessible to mobility challenged passengers. Petitioners also seek to enjoin respondents City of New York, the TLC and its Commissioner from enforcing the Accessibility Rules and a declaration that those rules violate section 19-533.[1] Respondents cross-move to dismiss the proceeding, claiming, to the extent relevant on this appeal, that petitioners' claims are barred by the applicable statute of limitations and the doctrine of laches. Careful examination of both the statutory scheme and the Accessibility

---

1. On this appeal, petitioners do not challenge Supreme Court's denial of their motion for class certification.

Rules demonstrates that petitioners' claims are without basis and that affirmance is appropriate, albeit on somewhat different grounds.

I. Historical Background

In 2005, with the manifest aim of addressing issues of air quality and fuel conservation, and at a time when the TLC had not yet approved any vehicle that could be used with medallions restricted to use with alternative fuel vehicles, which it had already begun to issue pursuant to City Council authorization (see Administrative Code § 19-532), the Council enacted Administrative Code § 19-533, entitled "Clean air taxis," which provides as follows:

> "The commission shall approve one or more hybrid electric vehicle models for use as a taxicab within ninety days after the enactment of this law. The approved vehicle model or models shall be eligible for immediate use by all current and future medallion owners. For the purposes of this chapter, a hybrid electric vehicle shall be defined as a commercially available mass production vehicle originally equipped by the manufacturer with a combustion engine system together with an electric propulsion system that operates in an integrated manner."

On April 30, 2014, the TLC promulgated the Accessibility Rules, which prescribed a process under which half of the City's taxi fleet would become wheelchair-accessible within several years. Specifically at issue here are two sections of the Accessibility Rules, the first of which addresses the start date of the TLC's accessibility program (35 RCNY 51-03) and the second of which sets forth requirements for replacement of certain vehicles being mandatorily retired with accessible vehicles (35 RCNY 58-50). The first provision, section 51-03, defines "Accessible Conversion Start Date," i.e., the date of commencement of the TLC's accessible conversion program, as "the earlier of (1) the date on which there is available an Accessible Taxicab Model that meets . . . the requirements of § 19-533 of the Administrative Code . . . or (2) January 1, 2016" (35 RCNY 51-03). The second provision, section 58-50, sets forth the requirements for replacement of vehicles using minifleet and independent medallions being mandatorily retired with accessible vehicles, although the requirements are implemented differently as to those two types of medallions. Under that sec-

tion, as of the Accessible Conversion Start Date, minifleet medallion owners must replace their vehicles being mandatorily retired with accessible vehicles until at least 50% of their fleets have been replaced with such vehicles (35 RCNY 58-50 [a] [i]). Independent medallions used by vehicles to be mandatorily retired within a particular period are entered into a lottery in which 50% of those medallions are selected for mandatory replacement of the vehicles using them with accessible vehicles (35 RCNY 58-50 [c] [i], [iii]).

In a further provision, the Accessibility Rules provide for a "Taxicab Improvement Fund" (*see* 35 RCNY 58-16 [g]) and a "Street Hail Livery Improvement Fund" (*see* 35 RCNY 82-17 [g]), which provide grants to medallion owners and licensees required to purchase accessible vehicles. The funds are financed by a $0.30 per ride surcharge, and the total amount of surcharges collected exceeds $40 million. An initial grant of $14,000 per vehicle is awarded to medallion owners and licensees required to convert to accessible vehicles, and an additional grant of $4,000 per year is awarded for each of the four years such a vehicle is required to remain in service.

Significantly, by 2014, the TLC had approved for use numerous alternative fuel vehicles, all but one of which was a hybrid electric vehicle satisfying section 19-533. By January 1, 2016, however, it had not approved any section 19-533 compliant hybrid electric vehicle which was also accessible, because no such vehicle existed.

Petitioners argue that in the absence of an available, accessible vehicle that meets the requirements of Administrative Code § 19-533, the Accessibility Rules are in irreconcilable conflict with the statute, and that the TLC is without authority to mandate that medallion owners replace vehicles being retired with non-hybrid electric wheelchair-accessible vehicles. Although petitioners present a skillful argument that the language of section 19-533, viewed in isolation, suggests such a construction, their argument is incompatible with the language of the statute, its legislative purpose, and with any sensible assessment of the intent of the City Council in enacting the statutory scheme.

## II. The Statutory Mandate

The precise directive of section 19-533 is that the TLC "shall approve one or more hybrid electric vehicle models" and that "[t]he approved vehicle model or models *shall be eligible* for immediate use by all current and future medallion owners"

(emphasis added). The TLC fulfilled this mandate in 2014 by approving certain hybrid electric vehicles for use as taxicabs and making them eligible for immediate use by medallion owners.

■ Section 19-533 does not direct that in every case in which a vehicle is to be purchased or leased by a medallion owner, the TLC must make purchase or lease of a hybrid electric vehicle a requirement, however (*see Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 121 AD3d 21, 35 [1st Dept 2014] ["Administrative Code § 19-533 did not require the TLC to limit the entire fleet to hybrid vehicles, or preclude its approval of a non-hybrid for use as taxis"], *affd* 25 NY3d 600 [2015]). Neither does the statute mandate that the TLC take hybrid electric vehicles into account whenever it promulgates a new set of rules. Rather, the legislative intent of section 19-533 was merely "to encourage the use and development of alternative fuel vehicles, including hybrid electric vehicles" (Local Law No. 72 [2005] of City of NY § 1 [enacting Administrative Code § 19-533, eff July 20, 2005]). Had the City Council intended for the TLC to *require* hybrid electric vehicles, it could have explicitly done so.

In any event, in 2006, the year after section 19-533 was enacted, the City Council enacted Administrative Code § 19-534. That statute mandated that the TLC develop, approve and implement a plan to increase the number of both clean air and accessible vehicles. Thus, prior to the adoption of the Accessibility Rules, including both sections 51-03 and 58-50, the City Council demonstrated its intent to increase the number of both alternative fuel and accessible taxicab vehicles, rather than to mandate solely the increased deployment of hybrid electric vehicles to the exclusion of other models of alternative fuel and accessible vehicles.

In keeping with this legislative intent, the TLC promulgated sections 51-03, 58-50 and the other aspects of the Accessibility Rules. In those rules, the TLC established a precondition for commencement of the program that encouraged the development of a vehicle that is both compliant with section 19-533 and accessible, consistent with its twin statutory mandates of promoting cleaner air and serving disabled passengers. Recognizing that such a vehicle might not be developed, however, the TLC included language in this rule limiting the time period in which this precondition remained in effect to no later than January 1, 2016, 20 months after the Accessibility

Rules were promulgated. In doing so, the TLC rationally promulgated rules providing for a reasonable period of time for the development of an accessible hybrid electric vehicle while ensuring that, at minimum, the TLC's mandate to increase the number of accessible taxicabs would be fulfilled.

Overall, the Accessibility Rules merely provide for the implementation of a taxicab conversion program designed to increase the number of accessible taxicab vehicles to 50% of New York City's taxi fleet by 2020. In furtherance of that purpose, the Accessibility Rules provide for the establishment of two funds, one for taxicabs and one for street hail livery vehicles, to subsidize required conversions of taxicabs and livery vehicles to accessible vehicles and to cover expenses for the required training of taxicab and livery drivers in the operation of accessible vehicles. None of these provisions of the Accessibility Rules is inconsistent with the section 19-533 requirement that the TLC "approve one or more hybrid electric vehicle models for use as a taxicab." Thus, respondents did not violate section 19-533 by promulgating the Accessibility Rules.

## III. Article 78 Relief

Petitioners claim entitlement to article 78 relief on the grounds that the TLC's promulgation and implementation of the Accessibility Rules were arbitrary, capricious and affected by errors of law. A review of the agency's actions in this context belies these claims.

In 2013, in furtherance of both the section 19-533 requirement and so much of the TLC's section 19-534 mandate as required it to develop plans to increase the number of clean air vehicles in New York City, the TLC revised its "Taxi of Tomorrow Rules" to permit medallion owners the option to purchase any one of three approved hybrid vehicles in lieu of a TLC-approved non-hybrid vehicle, the Nissan NV200, also known as the Taxi of Tomorrow (see *Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 121 AD3d at 27) and referred to in the Taxi of Tomorrow Rules as the Official Taxicab Vehicle (35 RCNY 67-03 [h]).[2] Having promulgated rules that would increase the number of hybrid electric taxicabs in a manner compliant with both section 19-533 and section 19-534, the TLC then promulgated the Accessibility Rules, in furtherance of that aspect of section 19-534 that required a plan to increase

---

**2.** 35 RCNY 67-03 (h) defines "Official Taxicab Vehicle ('OTV')," in relevant part, as "the purpose built taxicab for model years 2014 - 2024 manufactured, pursuant to the City's contract with Nissan North America."

the number of accessible vehicles in the New York City taxi fleet.

Closer analysis of five sections of the Accessibility Rules, 35 RCNY 58-50 (a) (i), (ii); (c) (i), (ii) and (iii), in particular, illustrates the consistency of the Accessibility Rules with both section 19-533 and section 19-534. Subdivision (a) (i), which applies to minifleet medallions, and subdivision (c) (i), which applies to independent medallions, both provide, in virtually identical language, that beginning on the Accessible Conversion Start Date as mandated by 35 RCNY 51-03, 50% of all unrestricted medallion taxicabs be replaced with an "Accessible Taxicab that meets the requirements of Section 67-05.2 of these Rules."[3]

Subdivisions (a) (ii) and (c) (ii), applicable to minifleet and independent medallions, respectively, provide in nearly identical language that "[f]ollowing the Accessible Conversion Start Date *and beginning at such time that there is available a vehicle qualified for use with an Alternative Fuel Medallion that is also qualified as an Accessible Taxicab under Chapter 67 of these Rules*" (emphasis added), 50% of alternative fuel medallions for which a new vehicle is to be placed in service shall be replaced with a vehicle that is both an alternate fuel and accessible vehicle. Those vehicles qualified for use with an Alternative Fuel Medallion include "vehicle[s] powered by compressed natural gas" as well as "hybrid electric vehicle[s]" (35 RCNY 51-03).

Subdivision (c) (iii), which is applicable solely to independent medallions, provides for a biannual lottery to determine which independent medallions associated with vehicles being retired will be subject to the subdivision (c) (i) requirement (and, once a qualified vehicle is available, the subdivision [c] [ii] requirement). Pursuant to subdivision (c) (iv), for vehicles being retired from July 1 to December 31 of a given year, the lottery is to be conducted on or before January 1 of that year, and for vehicles being retired from January 1 to June 30 of a given year, the lottery is to be held on or before July 1 of the preceding year.

While subdivisions (a) (i) and (ii) and (c) (i) and (ii) all require the replacement of each vehicle being retired with an "Acces-

---

**3.** 35 RCNY 67-05.2 sets forth TLC-approved specifications for accessible taxicab models, which specifications include, inter alia, "capab[ility] of transporting at least one passenger using a common wheelchair" (35 RCNY 67-05.2 [3] [a] [2]) and "not seat[ing] more than five passengers" (35 RCNY 67-05.2 [3] [a] [3]).

sible Taxicab," the vehicle model required to be used as a replacement is further delineated by 35 RCNY 67-05.1B (b) (2), which provides that in the case of an unrestricted medallion issued prior to January 1, 2012 that becomes "restricted by law or rule of the Commission to use with an Accessible Vehicle, the owner of such medallion must purchase an [Accessible Official Taxicab Vehicle] or lease such medallion for use with an [Accessible Official Taxicab Vehicle]." An "Accessible Official Taxicab Vehicle ('Accessible OTV')" is defined as an "OTV modified in a manner that is consistent with the City's contract with Nissan North America" (35 RCNY 67-03 [a]). Thus, under these rules, the owner of such a medallion is required to purchase, or lease that medallion for use with, an Accessible Nissan NV200, also known as an Accessible Taxi of Tomorrow. A waiver of this requirement may be sought, however, and, if granted, the medallion owner may replace the vehicle being retired with a TLC-approved accessible vehicle other than the Accessible Nissan NV200 (35 RCNY 67-05.1B [b] [2]).

The Accessibility Rules thus facilitate the goal of increasing the number of accessible taxicab vehicles available for passengers with mobility issues while realistically furthering the equally important goal of increasing the number of clean air cabs available in New York City. Moreover, these rules were subjected to the process of public hearings and review prior to their approval and implementation by the TLC. Accordingly, in promulgating these rules, the TLC acted in a rational manner, and consistently with the statutory mandate.

Moreover, the TLC acted in furtherance of both the accessibility and clean air aspects of its statutory mandate by setting forth a regulatory scheme that made the date of commencement of the accessible conversion program contingent upon future development of a combined accessible/hybrid electric vehicle, and by establishing an alternative contingent date of January 1, 2016 for the commencement of the program in the event such a vehicle had not been developed by that date. In doing so, the TLC both provided an incentive for manufacturers to develop such a vehicle and created an opportunity for the early promotion of both cleaner air and accessibility.

Thus, the TLC did not act arbitrarily and capriciously in promulgating the Accessibility Rules. As these rules are consistent with both section 19-533 and section 19-534, there was no error of law on TLC's part in promulgating them.

Therefore, Supreme Court providently denied article 78 relief to petitioners.

## IV. Injunctive Relief

In order to be entitled to injunctive relief, petitioners were required to show a likelihood of success on the merits and irreparable injury to themselves (*see* CPLR 6301). They have done neither.

■ Because the Accessibility Rules are compliant with section 19-533 for the reasons stated above, petitioners have failed to show that they would be likely to succeed on the merits were litigation of the instant petition to continue. Petitioners have also failed to demonstrate that they have suffered any prejudice from the unavailability of a hybrid electric accessible taxicab. The Taxicab Improvement Fund is available to reimburse their costs of purchase or lease of an accessible taxicab. Moreover, under the Accessibility Rules, any medallion owner required to replace a retiring medallion vehicle with an accessible vehicle may transfer that requirement to the owner of another medallion who is required to replace a medallion vehicle in the same calendar year, allowing the medallion owner to purchase or lease a hybrid electric vehicle (35 RCNY 58-50 [e] [i]). Alternatively, upon obtaining a waiver, a medallion owner may purchase the MV-1 Accessible CNG, an alternative fuel (compressed natural gas) vehicle that is also accessible and which is currently listed among the vehicles qualified for use of a medallion by the TLC (*see* New York City Taxi & Limousine Commission, Vehicles Approved as Taxicabs, http:// www.nyc.gov/html/tlc/html/industry/taxicab_vehicles_in_use .shtml [accessed Sept. 22, 2016]; 35 RCNY 67-05.1B [b] [2]).

## V. Declaratory Relief

Because the Accessibility Rules did not violate section 19-533 for the reasons stated above, petitioners are not entitled to a declaration to the effect that those rules violated that statute. Therefore, Supreme Court providently denied petitioners' motion for a declaratory judgment.

## VI. Timeliness

Respondents cross-moved to dismiss the petition, claiming that the petition was barred on statute of limitations and laches grounds. Supreme Court dismissed the petition on statute of limitations grounds, without reaching respondents' laches claim, reasoning that the four-month limitations period

of CPLR 217 (1) began when petitioners received letters from the TLC Chair dated August 17, 2015 notifying them of the selection in the lottery of their independent medallions for inclusion in the conversion program. Although the petition is not barred on either ground, it must be dismissed due to lack of ripeness of the controversy.

## A. Statute of Limitations

An article 78 proceeding must be commenced within four months after the agency determination in question becomes "final and binding" upon the petitioner (CPLR 217 [1]). For purposes of the present analysis, an agency determination becomes "final and binding" when two events have occurred. First, "the agency must have reached a definitive position on the issue that inflicts actual, concrete injury" (*Matter of Best Payphones, Inc. v Department of Info. Tech. & Telecom. of City of N.Y.*, 5 NY3d 30, 34 [2005]). And second, the petitioner must have received notice of that determination (*see New York State Assn. of Counties v Axelrod*, 78 NY2d 158, 165-166 [1991]; *90-92 Wadsworth Ave. Tenants Assn. v City of N.Y. Dept. of Hous. Preserv. & Dev.*, 227 AD2d 331 [1st Dept 1996]).

In this case, as of December 30, 2015, the date of commencement of this proceeding, implementation of the TLC's conversion program had not yet "inflict[ed] actual, concrete injury" on petitioners, as the program did not commence until January 1, 2016. Petitioners had merely received notice of the selection in the lottery of an independent medallion owned by each of them for inclusion in the conversion program in the August 17, 2015 letters from the TLC Commissioner. Thus, the TLC determination was not yet "final and binding" on them when they received notification of their selection in the lottery (*cf. New York State Assn. of Counties v Axelrod*, 78 NY2d at 165-166; *90-92 Wadsworth Ave. Tenants Assn. v City of N.Y. Dept. of Hous. Preserv. & Dev.*, 227 AD2d at 332).

Thus, petitioners' article 78 claims were not barred by the four-month statute of limitations at the time the proceeding was commenced, and indeed, were not then ripe. Therefore, dismissal was appropriate, but not on the ground cited by Supreme Court.

## B. Laches

Respondents also argue that dismissal of the instant petition is warranted based upon the doctrine of laches. Laches is an

affirmative defense, which must be so pleaded (*see Kromer v Kromer*, 177 AD2d 472, 473 [2d Dept 1991]). As respondents have failed to serve and file an answer raising this affirmative defense, they are not entitled to rely upon it to support dismissal here.

Accordingly, although we agree with petitioners that the petition is neither time-barred nor subject to dismissal as barred by the doctrine of laches, we agree with the article 78 court that the Accessibility Rules are not violative of section 19-533; that the TLC's action in adopting the Accessibility Rules was neither arbitrary and capricious nor affected by any error of law; that petitioners were not entitled to a preliminary injunction; that petitioners were not entitled to declaratory relief; and that the petition must be dismissed. We modify solely to declare in respondents' favor.

Accordingly, the judgment of the Supreme Court, New York County (Manuel J. Mendez, J.), entered February 18, 2016, among other things, denying the petition in this hybrid CPLR article 78 proceeding and declaratory judgment action, denying injunctive and declaratory relief, and dismissing the proceeding, should be modified, on the law, to the extent of declaring that the Accessibility Rules were not violative of Administrative Code § 19-533, and otherwise affirmed, without costs.

MAZZARELLI, J.P., ACOSTA, SAXE and KAPNICK, JJ., concur.

Judgment, Supreme Court, New York County, entered February 18, 2016, modified, on the law, to declare that the Accessibility Rules were not violative of Administrative Code § 19-533, and otherwise affirmed, without costs.